UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CONFIDENTIAL

| | |
|---|---|
| JANE DOE,<br><br>    Plaintiff<br><br>    V.<br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA AND GROUP LONG TERM DISABILITY PLAN NO. 23041<br><br><br>    Defendants | CIVIL ACTION NO. |

## COMPLAINT

1.  Plaintiff, Jane Doe ("Ms. Doe") brings this action against the Defendants, Prudential Insurance Company of America ("Prudential") and Group Long Term Disability Plan, No. 23041 ("Plan") (collectively referred to as "Defendants") for violation of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et. seq.* ("ERISA"). Ms. Doe is a participant in an ERISA welfare benefit plan that is underwritten and insured by Prudential. The group plan number is 23041.

2.  This Complaint challenges the Defendants': 1) unreasonable and unlawful denial of Ms. Doe's long term disability ("LTD") income benefits despite the substantial medical and vocational evidence demonstrating Ms. Doe's qualifications for said benefits; 2) pattern of rejecting and/or ignoring the substantial evidence supporting Ms. Doe's partial disability due to her physical condition; 3) failure to provide Ms. Doe with a full and fair review of her claim; 4) purposeful and erroneous re-characterization of Ms. Doe's illness as mental in nature to limit

Defendants' financial exposure for Ms. Doe's claim; and 5) failure to provide a reasonable claims procedure that would yield a decision on the merits of Ms. Doe's claim.

3.    Ms. Doe is filing this action to recover benefits due under the Plan, to enforce the present rights existing therein, to clarify rights under the terms of the Plan and to recover costs and attorneys' fees as provided by ERISA, plus interest on back amounts owed.

### JURISDICTION

4.    This Court has personal and subject matter jurisdiction over this case under 29 U.S.C. § 1132(e) and (f), without regard to jurisdictional amount or diversity of citizenship, in that the Defendants' breach of their ERISA obligations took place in this district.

### PARTIES

5.    Plaintiff Ms. Doe is a 44-year-old individual who currently resides in Hingham, Massachusetts.  Ms. Doe is a vested participant in a Prudential employee benefit plan, within the meaning of 29 U.S.C. § 1002(2)(7).  Ms. Doe has standing to bring this action under 29 U.S.C. § 1132(a).

6.    Defendant Prudential Insurance Company of America ("Prudential") is a for-profit corporation with its principal place of business at 751 Broad Street, Newark, New Jersey, 07102-3777.  Prudential transacts business in Massachusetts and insures and underwrites the Plan under which Ms. Doe is suing.  Prudential is the party responsible for processing claims made under the Plan and making a determination as to Plan participants' eligibility for LTD benefits.

7.    At all times relevant to the claims asserted in this Complaint, Prudential purported to act as an ERISA claims fiduciary with respect to participants of the Plan, generally, and specifically, with respect to Ms. Doe, within the meaning of ERISA.

8.    The Plan under which Ms. Doe is suing is a "long term disability plan" issued by Prudential and maintained continuously thereafter by Prudential. The Plan number is 23041.

## FACTS

**Insurance Entitlement, Definitions of Disability, Discretion.**

9.    In January 2000, Ms. Doe began working full-time at a prestigious Boston law firm (the "Firm"). Ms. Doe was provided with LTD benefits under a contract between the Firm and Prudential. At the time she became partially disabled, Ms. Doe was a partner and full time employee at the Firm.

10.   Prudential both funds and administers the Plan under which Ms. Doe is suing.

11.   The Firm has no discretionary authority to determine a participant's eligibility for LTD benefits and to interpret the terms and provisions of the Plan.

12.   The Plan does not contain any provisions giving independent and final discretion to Prudential to determine eligibility for benefits or to interpret the terms of the Plan.

13.   The Plan provides for the payment of LTD benefits when an insured person becomes either partially or totally disabled.

14.   Under the terms of the Plan, Ms. Doe is entitled to receive 60% of her monthly earnings per month.

15.   Ms. Doe's maximum period of payment under the Plan is age 67, her normal retirement age under the Social Security Act. .

16.   The Plan defines "total disability" as follows:

You are disabled when Prudential determines that:

- you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury***; and
- you have a 20% or more loss in your ***indexed monthly earnings*** due to that ***sickness*** or ***injury***.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience.

17.   "Gainful occupation" is defined as "an occupation, including self employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work."

18.   "Sickness" is defined as "any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan."

19.   The Plan also contains two exclusions on benefits. The first provision excludes benefits beyond two years, as opposed to age 67, for disabilities due to mental illnesses.

20.   The second provision excludes benefits beyond two years, as opposed to age 67, for disabilities based "primarily" on self-reported symptoms that are not verifiable using tests, procedures, and clinical examinations standardly accepted in the practice of medicine.

4

21.    The Plan states:

### "What Disabilities Have a Limited Period Under Your Plan?

Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime.

The limited pay period for self reported symptoms and mental illness combined is 24 months during your lifetime.

Prudential will continue to send you payments for disabilities due in whole or part to mental illness beyond the 24 month period if you meet one or both of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Prudential will continue to send you payments during your confinement.

    If you are still disabled when you are discharged, Prudential will send you payments for a recovery period of up to 90 days.

    If you become reconfined at any time during the recovery period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the additional confinement and for one additional recovery period up to 90 more days.

2. In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital or institution for at least 14 days in a row, Prudential will send payments during the length of the confinement.

Prudential will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Prudential will not apply the mental illness limitation to dementia if it is a result of:

- stroke
- trauma

5

- viral infection
- CD Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotropic drugs, other similar methods of treatment as standardly accepted in the practice of medicine.

(hereinafter referred to as "Mental Illness Limitation").

22.    "Self-reported symptoms" is defined as: "the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy."

23.    "Mental Illness" is defined as "Mental illness means a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine."

**Onset of Ms. Doe's Disability.**

24.    Ms. Doe lives in Plymouth County on approximately 3.5 acres of land, much of which is wooded or contains tall grass, and she has seen deer roaming her property very close to her house.  Ms. Doe's county is endemic for Lyme disease. In 2005, as in all previous years, she had an active lifestyle that involved many outdoor activities.

25.   In the latter part of 2005, Ms. Doe began experiencing unusual fatigue. Like many people would, Ms. Doe dismissed her symptoms as she simply believed that she was working too hard. She was also experiencing problems with her memory, a symptom also noticed by her husband and others around her.

26.   Shortly thereafter, Ms. Doe noticed a large expanding bruise on her right hip and swelling in her right groin area. She went to her primary care physician who immediately sent her to the emergency room to be examined. After going through a battery of tests, it was determined that Ms. Doe had swollen lymph nodes. It was around this time that Ms. Doe also began experiencing a headache that worsened each day and did not go away with over-the-counter medication.

27.   By October 19, 2005, Ms. Doe was in so much pain from this headache that she went to the emergency room in the middle of the night. While in the hospital, the doctors performed CT scan in order to rule out a brain aneurysm. While awaiting the results of this test, Ms. Doe mentioned the rash on her right hip. She reported that she thought she had been bitten by something, and that the rash continued to expand in size daily. The doctor diagnosed the rash as an Erythema Migrans rash highly characteristic of Lyme, and coupled with Ms. Doe's other symptoms, diagnosed her with Lyme disease that evening.

28.   Ms. Doe was discharged from the hospital with two weeks worth of doxycycline to treat her Lyme disease. A few hours later, Ms. Doe was back at the emergency room as her symptoms had returned with a vengeance and she was vomiting up her medication. After being treated for a second time, Ms. Doe was released with instructions to take antibiotics for Lyme.

29.   Although Ms. Doe experienced a significant improvement in her condition shortly after starting the antibiotics, all her symptoms returned within a few days after completing the two-week course of treatment. In November of 2005, she returned to her primary case doctor, who concluded that Ms. Doe's case of Lyme disease may have been undertreated and prescribed a three-week course of the same antibiotic. Ms. Doe's primary care doctor also drew blood to test for Lyme disease.

30.   On November 9, 2005, Ms. Doe's titers were positive for Lyme disease. Specifically, she tested positive for Lyme disease under both the ELISA test *and* the Western Blot (IgM). As required by law, these positive blood test results were reported to the Massachusetts Department of Public Health ("DPH"). Based on positive blood test results, as well as other reported information from Ms. Doe's treating doctors, the DPH classified Ms. Doe's case of Lyme disease as "confirmed."

31.   Ms. Doe's case of Lyme disease is also classified as "confirmed" under the Center for Disease Control's ("CDC") surveillance case definition, which is so overly restrictive that the CDC cautions it should not be used for diagnostic purposes.

32.   After coming off the second round of antibiotics, Ms. Doe continued to intermittently experience symptoms of Lyme disease, with increased neurological and cognitive impairments. Ms. Doe's primary care doctor referred her to an infectious disease doctor, who determined that Ms. Doe might have a long convalescence from her Lyme disease. None of the doctors Ms. Doe met with during these first few months mentioned the possibility that she may also have

other tick-borne infections ("co-infections") that can be transmitted by the same tick bite that causes Lyme disease.

33.     Despite her worsening symptoms, Ms. Doe continued attempting to maintain her full-time work schedule. However, it becoming increasingly difficult for Ms. Doe to meet both her own personal expectations and those set by the Firm. Nevertheless, Ms. Doe refused to give up, believing that her condition would soon improve.

34.     Ms. Doe continued to struggle with her symptoms throughout the remainder of 2005 and through 2006. In August 2006, Ms. Doe was examined by Dr. Amiram Katz, a Lyme disease specialist. Dr. Katz informed Ms. Doe that her Lyme disease had only been partially treated and that she was suffering from chronic Lyme disease and Post-Lyme Autoimmune Disorder.

35.     By January 2007, Ms. Doe was forced to make the decision to move to part-time work at the Firm. Ms. Doe realized, with the support of Dr. Katz, that she had to move to a part-time work schedule in order to manage her symptoms and overall health and to better serve her clients.

36.     As a result, Ms. Doe began the process of applying for partial disability benefits from Prudential under her Firm's Plan. As a part of this application, the Firm's Human Resource Manager wrote Prudential on January 16, 2007, to explain Ms. Doe's employment status, in response to a request from Prudential. In her submission, the Human Resources Manager explained that Ms. Doe had "only worked at about 40-60% capacity in the past few months, and as of January 1, 2007, her salary was reduced to $82,000 as a result of her part time schedule due

9

to her disability." The Human Resources Manager also enclosed Ms. Doe's earnings for 2003, 2004, 2005, and 2006 to illustrate the decline in Ms. Doe's productivity due to her illness.

37. On January 19, 2007, Prudential wrote Ms. Doe requesting that she provide Prudential with an Attending Physician's Statement ("APS"). Dr. Katz completed the APS on January 31, 2007, noting that Ms. Doe suffers from cognitive difficulties, extreme fatigue, and chronic daily headaches, which he attributable to Lyme disease. Dr. Katz further noted that Ms. Doe could not perform her job as an attorney due to her medical illness.

38. On February 9, 2007, Ms. Doe's Firm wrote Prudential enclosing Ms. Doe's job description as well as a monthly breakdown of Ms. Doe's billable hours back to January 2004. In 2004, before Ms. Doe became ill, Ms. Doe averaged approximately 130 *billable* hours a month. In 2005 and 2006, Ms. Doe's billable hours decreased to an average of around 87 hours per month and 91 *billable* hours per month, respectively.

39. On February 12, 2007, Ms. Doe spoke with Shannon Glidden of Prudential regarding her claim. Ms. Doe informed Ms. Glidden of her diagnosis and symptoms. She also explained to Ms. Glidden that she had continued to try to work despite her symptoms because the she was assured that she would eventually get better. Unfortunately, because she continued to have good days and bad days, Ms. Doe indicated that she finally had to officially curtail her work status from full-time to part-time in January 2007.

40.     On March 15, 2007, in a Prudential internal note, Ms. Glidden indicated that Ms. Doe's claim should be denied because she did not meet the eligibility requirements for coverage. Specifically, Ms. Glidden noted that Ms. Doe did not work the requisite 30 hours a week because her billable hours were so low.

41.     Ms. Glidden made the mistake of assuming that Ms. Doe's billable hours are equivalent to the number of hours she worked per day. For example, Ms. Glidden believed that if Ms. Doe billed 30 hours in a week, she only worked 30 hours per week, which is incorrect. Widespread studies of attorney billable time requirements demonstrate that on average, it takes 3 hours of time to bill 2 hours of time on a client matter. Moreover, billable time does not include time spent on marketing, continuing education, trainings, administrative matters, management of employees, supervision and mentoring of junior attorneys, etc., all of which were part of Ms. Doe's essential responsibilities as a partner at the Firm.

## Prudential's First Denial of Ms. Doe's Claim – April 2007.

42.     In April 2007, Prudential wrote Ms. Doe denying her claim for LTD benefits. As grounds for this decision, Prudential indicated that Ms. Doe did not meet the eligibility requirements for coverage because she was not working the requisite number of hours per month to be insured under the Plan. Prudential did not deny Ms. Doe's claim on medical grounds.

43.     In April 2007, Ms. Doe requested a copy of her claim file. After reviewing the file, Ms. Doe emailed Ms. Glidden asking if their telephone conversations had been recorded, because the documentation of their conversations was inaccurate in several material respects, all of which were self-serving to Prudential. Ms.

Glidden noted that the calls were not recorded, but that Ms. Doe could detail her understanding of the content of the telephone calls for Prudential's review.

## Ms. Doe's First Appeal of Prudential's Denial – June 13, 2007

44. On June 13, 2007, Ms. Doe wrote Prudential appealing its decision to deny her benefits. In her appeal, Ms. Doe included two letters – one from the Managing Partner and the other from the Deputy Managing Partner and Chair of the Litigation Department at her Firm, detailing the difference between her work hours and her billable hours. In addition, the Deputy Managing Partner and Chair of the Litigation Department noted that since October 2005, he watched Ms. Doe struggle with her illness and its disabling effects and that there were many occasions that Ms. Doe came to work despite the fact that it was visibly obvious to him that she was very physically ill.

45. Following the submission of her appeal, Prudential, at the recommendation of Tracey DuPerry of Prudential, conducted surveillance of Ms. Doe over the course of three days. During that time, the private investigator was secretly stationed outside Ms. Doe's house, he followed her to a daycare facility and took videotape footage of her and her very young daughter, he followed her onto her commuter boat to Boston, and he followed her in the car for almost an hour to her parents' house. Since learning of this surveillance, Ms. Doe has not felt safe, secure or private in her own home, yard, car or anywhere she goes.

46. The total amount of surveillance footage acquired by the investigators was 6 minutes and 22 seconds. The surveillance was conducted by Capital Investing & Adjusting on June 20, 22, and 27, 2007, at a cost of $1,493.88.

47. The surveillance footage was consistent with Ms. Doe's reports to Prudential that she works part-time, as evidenced on the footage, and has good days and bad, as exemplified by her limited activity. Prudential has not relied upon any information obtained during this surveillance in any of its denial or termination decisions.

48. On June 19, 2007, Prudential referred Ms. Doe's file for a medical review, even though its initial denial of her claim was not based on a lack of medical support for Ms. Doe's disability. This review was conducted by Daniel S. Berman, M.D. Dr. Berman concluded that although Ms. Doe may have suffered from Lyme disease "at some point," her illness had been treated, and she did not suffer from any further functional limitations after November 2, 2005. However, Dr. Berman admitted that he "[did] not know what the cause of [Ms. Doe's] symptoms is now after completing treatment for the Lyme disease," and he further qualified his opinion by stating that treatment of such disorders is "not within the area of my expertise."

49. Dr. Berman did not offer any explanation for why Ms. Doe's functional limitations ended on November 2, 2005, even though Ms. Doe's primary care doctor concluded that her Lyme disease had been "undertreated" and she put Ms. Doe on a second round of antibiotics in November 2005 when all her symptoms immediately returned after ending the first round of antibiotics.

13

**Prudential's Second Denial of Ms. Doe's Claim – July 30, 2007.**

50.     On July 27, 2007, Prudential conducted a review of Ms. Doe's file, noting that Ms. Doe "may have met the minimum number of hours required under the policy."

51.     However, on July 30, 2007, Prudential denied Ms. Doe's claim for a second time on the basis that there was no medical support for her disability.

**Ms. Doe's Second Appeal of Prudential's Denial of Her Claim - February 25, 2008.**

52.     On February 25, 2008, Ms. Doe again appealed Prudential's denial of her claim for benefits, submitting medical information from Dr. Katz supporting her partial disability, as well as documentation from her Firm regarding her inability to maintain the duties of her occupation on a full-time basis. Ms. Doe's appeal also included supporting affidavits from her family and former partners, testimony from Ms. Doe regarding her illness and functional limitations and an independent vocational examination supporting Ms. Doe's entitlement to partial disability benefits under the Plan definition of disability.

**Prudential's Response to Ms. Doe's Second Appeal.**

53.     On March 26, 2008, Prudential requested that Ms. Doe undergo neuropsychological testing with Aaron Nelson, Ph.D. to "determin[e] her level of cognitive functioning."

54.     By Dr. Nelson's own admission, "assigning a diagnosis of Lyme disease [was] beyond the scope of [his] expertise." Nevertheless, Dr. Nelson determined that Ms. Doe "exhibits *reliable and valid evidence* of variable, mild impairment on measures entailing sustained attention and executive function." Dr. Nelson noted

that these types of deficits in cognitive functioning "can be exhibited by patients with neurologic disease." Dr. Nelson further noted that Ms. Doe's performance on a measure of reading comprehension (Nelson-Denny) was particularly poor; *she appeared fatigued during this test, which was the last measure in the assessment battery*." (Emphasis added). Dr. Nelson also concluded that the test results were consistent with Ms. Doe's self-reported symptoms.

55.    On April 12, 2008, Ms. Doe's blood test was *positive* for Babesia microti, a co-infection that is transmitted by the same tick bite that causes Lyme disease. Ms. Doe had not received any prior treatment for this co-infection, which differs from the treatment for Lyme disease. Medical literature reports that the presence of co-infections, such as Babesia microti, Bartonella henselae and Mycoplasma pneumoniae, are known to make Lyme disease symptoms more severe and longer in duration, and they can complicate treatment and adversely affect the prognosis for recovery from Lyme disease.

56.    On April 14, 2008, Dr. Michael Silverman conducted a paper review of Ms. Doe's file at the request of Prudential.

57.    Dr. Silverman was working for MLS Peer Review Services at the time he completed his review of Ms. Doe's file.

58.    Dr. Silverman determined that: "[Ms. Doe] is *clearly diagnosed with Lyme disease* from October 2005 with evidence of typical rash consistent with onset of Lyme's (sic) disease. *Presentation was consistent with neurological involvement with severe headaches, photophobia and difficulty concentrating*." (Emphasis added). Accordingly, he concluded that "[f]rom 11/2/05 to 2/1/06, impairment

15

from an infectious disease standpoint is supported by the available medical evidence. However, from 2/1/06 forward, impairment is not further supported thereafter."

59. Dr. Silverman offered no explanation for why he chose February 1, 2006 as the date Ms. Doe's impairment allegedly ended, nor did he point to any change in her symptoms or test results to justify this arbitrary cut-off date. Ms. Doe continued to have all the exact same partially disabling symptoms *after* 2/1/06 that Dr. Silverman opined were consistent with neurological Lyme disease *prior* to that date. However, Dr. Silverman's opinion that Ms. Doe was impaired through February 1, 2006, directly refuted Prudential's earlier file review by Dr. Berman who alleged no impairment after November 2, 2005.

60. In addition, Dr. Silverman concluded as follows:

> *The claimant's self-reported symptoms, which include pain and fatigue,* *<u>are supported</u> by diagnostic tests, laboratory studies and physical examination findings.* The claimant underwent two spinal taps which are consistent with clinical symptomatology consistent with headaches. *The claimant has continued medical follow up for clinical symptoms which are appropriate with the underlying diagnosis.* (Emphasis added).

61. On May 5, 2008, Dr. Silverman wrote an addendum of his April 14, 2008 review as a result of his analysis of Dr. Katz's April 10, 2008 and November 28, 2006 office notes. Even though Dr. Katz's office notes contained blood test results and physical examination findings that continued to support Ms. Doe's symptoms, Dr. Silverman indicated that Dr. Katz's office notes did not alter his "previous assessment" that Ms. Doe was no longer disabled as of February 1, 2006.

16

62. On May 30, 2008, after the ninety (90) days to review Ms. Doe's claim had
    expired, Prudential requested an extension of time to review Ms. Doe's appeal,
    indicating that it required payroll records from Ms. Doe's employer.

## Prudential's First Approval of Ms. Doe's Claim.

63. Finally, on August 5, 2008, *six months* after Ms. Doe submitted her second
    appeal, and almost *twenty months* after the onset of her disability, Prudential
    approved Ms. Doe's claim *without qualification and without any mention of any*
    *possible mental illness or limitation based on self-reported symptoms*.
    Prudential denied Ms. Doe's request for interest on the substantial amount of back
    benefits that Prudential eventually acknowledged it wrongfully denied Ms. Doe.

## Prudential's Cessation of Ms. Doe's Benefit Payments and the First Reference to the Mental Illness Limitation.

64. Following the approval of Ms. Doe's claim, Prudential only provided two benefit
    checks before ceasing payment to Ms. Doe on the basis that it wanted her to
    produce monthly profit/loss statements, which simply did not exist for her
    business.

65. Immediately after this decision, Prudential, on October 16, 2008, informed Ms.
    Doe that it was currently investigating whether Ms. Doe's claim fell under the
    "self-reported symptoms" and/or "mental illness" limitation in her Plan.
    Prudential further noted that it "will be *exploring this possibility* in the months to
    come, however we wanted to provide you with notice that we feel as of April 24,
    2008, Mrs. Doe's claim is limited to 24 months of benefits." (Emphasis added).

66. Prudential failed to explain how it had concluded that Ms. Doe's claim was
    limited to 24 months of benefits if Prudential was still "exploring this possibility."

67. Prudential's October 2008 letter made clear that Prudential had made a determination to limit Ms. Doe's benefits *before* even investigating whether it had any medical support to do so. Prudential's decision in this regard was arbitrary and capricious.

68. Moreover, Prudential's October 2008 letter failed to indicate which aspect of the Plan definition Prudential believed Ms. Doe's "diagnosis" fell – the "self-reported" or "mental illness" limitation.

69. Prudential's October 16, 2008 correspondence came as a shock to Ms. Doe. After all, Prudential took 18 months to allow her claim, after spending almost one year falsely alleging that she was ineligible for coverage on the basis of her billable hours. After Ms. Doe spent one appeal and countless hours of her Firm's time responding to Prudential's baseless arguments in this regard, Ms. Doe filed a second appeal addressing her eligibility for benefits as a result of her medical limitations and restrictions (this is after Prudential first raised this matter as a concern in its second denial letter).

## Ms. Doe's Appeal of Prudential's Claim that her Disability was Mental in Nature – November 2008.

70. On November 20, 2008, Ms. Doe appealed Prudential's decision to limit her benefits under the Mental Illness Limitation in her Plan.

71. Prudential did not respond to Ms. Doe's appeal or to her November 20, 2008 letter.

72. Prudential's failure to respond to Ms. Doe's November 2008 appeal constitutes a violation of ERISA's implementing regulations.

## Ms. Doe's Additional Medical Diagnosis

73.   In November 2008, Ms. Doe had her first mammogram of her life, which revealed
      suspicious abnormalities. After a second mammogram likewise showed
      abnormalities, she was scheduled for a biopsy in January 2009.

74.   In January 2009, Ms. Doe had a biopsy of her left breast that revealed she has
      Lobular Carcinoma In Situ ("LCIS"). As a result of this diagnosis, she was
      scheduled for more surgery. In February 2009, Ms. Doe had a partial mastectomy.
      In the following months, she consulted with oncologists and other doctors, as
      recommended by her surgeon, about her various options for treating her LCIS.

## Prudential's Request for Further Neuropsychological Testing.

75.   On February 10, 2009, Prudential requested that Ms. Doe undergo another
      neuropsychological examination at its expense.

76.   On March 8, 2009, Ms. Doe wrote Prudential confirming that she was unable to
      attend Prudential's scheduled testing because she was already undergoing
      neuropsychological testing with Cheryl Weinstein, Ph.D., in March 2009.

77.   Dr. Weinstein concluded that there was "reliable and valid evidence" of cognitive
      impairment on working memory and executive function, which she noted "can be
      exhibited by patients with neurological disease." Dr. Weinstein noted that her test
      findings were consistent with Ms. Doe's self-reports, there was internal
      consistency on this assessment, and there was general consistency between this
      assessment and the prior evaluation performed by Dr. Nelson.   Dr. Weinstein
      concluded that "[t]he degree of impairment reflected in this examination is mild to
      moderate and interferes with [Ms. Doe's] continuing ability to function in a

competitive fashion as a well regarded attorney." Dr. Weinstein diagnosed Ms. Doe with Cognitive Disorder NOS and Slowed Reading, but notably did not diagnose her with any mental illness.

## Prudential's Limitation of Ms. Prudential's Claim under the Mental Nervous Limitation and its Claim that she was Able to be "Gainfully Employed" – April 2009.

78. On May 4, 2009, counsel for Ms. Doe received a letter dated April 1, 2009 from Prudential indicating that Ms. Doe's claim was subject to the Mental Illness Limitation on the following basis: "It was determined that *after recovery from the Lyme infection* it would appear that impairment was based on reported symptoms, in the absence of significant objective abnormality, and the probability of a condition that, by definition, causes the over-perception of and over-reporting of symptoms (somatoform disorder)." (Emphasis added). Prudential's letter did not identify any evidence supporting its conclusory statement that Ms. Doe had recovered from her Lyme infection.

79. The letter further stated that Ms. Doe's claim became subject to the Limitation "as of the date of her Neuropsychiatric testing April 24, 2008." Prudential represented it would pay Ms. Doe benefits until April 24, 2010.

80. Prudential's decision in this regard came despite Dr. Nelson's conclusion that there was "no compelling evidence of depression, other mood disorder, or substance abuse" to explain Ms. Doe's symptoms. Dr. Weinstein likewise found "no compelling evidence of depression or mood disorder."

81. Prudential's May 4, 2009 letter re-wrote history. In particular, Prudential's termination of Ms. Doe's benefits was reversed in a letter dated August 5, 2008,

which approved her claim ***without any limitations*** many months after Prudential

had received Dr. Nelson's report. In fact, no mention was made in Prudential's

approval letter of the Mental Nervous Limitation, or that Prudential even

suspected that Ms. Doe would be subject to the Limitation.

82. Prudential's May 4, 2009 letter further indicated that:

Our review of Ms. Doe's file has determined that based on her medical
condition, restrictions and limitations and gainful wage, she can be
gainfully employed.  This was demonstrated by the part-time work she
was performing at her prior employer, [].

83. Prudential's determination in this regard contradicted the terms of the Plan.  In

order for Ms. Doe to receive benefits under her Plan, she is required to

demonstrate that she is unable "to perform the duties of any gainful occupation

for which she is reasonably fitted by education, training or experience."  The Plan

defines a "gainful occupation as "an occupation including self-employment, that

is or can be expected to provide you with an income equal to at least 60% of your

indexed monthly earnings within 12 months of your return to work."  Since April

2008, Ms. Doe had been self-employed – a decision she reluctantly made to

accommodate the symptoms of her condition – and had been unable to earn a

"gainful wage" as defined under the terms of the Plan.  Yet, Prudential determined

in May 2009 that Ms. Doe was able to earn a "gainful wage" based on her

abilities ***over one year prior***.

## Ms. Doe's Appeal of Prudential's May 4, 2009 Limitation of her Claim – May 2009.

84. On May 27, 2009, Ms. Doe appealed Prudential's May 4, 2009 determination that

her disability was due to a mental illness.

85. On June 17, 2009, Prudential responded to Ms. Doe's appeal refusing to act upon

Ms. Doe's appeal as Prudential had "not denied any benefits in whole or in part at this time" and that its May 2009 decision was not an "adverse determination" under ERISA. Prudential further wrote, "[a]*t this time **her benefits will continue** for as long as the medical information continues to support cognitive impairment from a mental and nervous diagnosis." (Emphasis added).*

86.     Prudential's determination in this regard constitutes a violation of ERISA's implementing regulations.

**Prudential's Second Termination of Ms. Doe's Benefits – October 2009.**

87.     On October 9, 2009, just over one year after approving her claim for benefits without any limitations, and less than four months after Prudential had represented it would pay Ms. Doe benefits through April 2010 so long as her medical information remained the same, Prudential abruptly terminated payment on Ms. Doe's claim on the basis that her "neuropsychological symptoms do not appear of the severity to preclude occupational function." Prudential's decision in this regard was based primarily upon a paper review by Prudential's employee, Melvyn Attfield Ph.D., of Ms. Doe's prior neuropsychological testing. Ms. Doe had not submitted any new information – medical, psychological or otherwise – in the preceding four (4) months to warrant this review.

88.     Dr. Attfield based his conclusions as stated above on a selective review of Ms. Doe's file, a lack of any analysis, discussion or acknowledgement of the specific occupational skills required for Ms. Doe's profession, as well as fundamental errors regarding both the nature and the results of the two neuropsychological tests Ms. Doe had undergone.

89.    For example, Dr. Attfield called into question the validity of Dr. Weinstein's neuropsychological testing because Prudential indicated that counsel for Ms. Doe was present at the exam.

90.    This conclusion was false, and Prudential later acknowledged that it was responsible for having conveyed this false information to Dr. Attfield.

91.    Moreover, Dr. Attfield discredited both neuropsychological tests because Ms. Doe had undergone the testing "on her own accord."

92.    This statement was also false. Prudential required Ms. Doe to undergone testing with Dr. Nelson, which was a doctor of Prudential's choosing.

93.    Ms. Doe brought these errors to Prudential's attention in November 2009, as they clearly affected Dr. Attfield's findings.

94.    On November 5, 2009, Prudential wrote Ms. Doe's counsel, stating that Dr. Attfield assured Prudential that the errors "didn't feature in my conclusions or recommendations."

95.    Prudential's claim in this regard is both self-serving, and directly refuted by the specific statements made by Dr. Attfield in his report.

96.    In addition, Prudential relied upon Dr. Berman's 2007 report to determine that Ms. Doe had been cured of Lyme disease in 2005. This decision was contrary to Prudential's determination in 2008 that Ms. Doe both suffered from Lyme disease and was partially disabled as a result of the symptoms of the illness.

97.    Prudential wholly ignored Dr. Katz's findings, the objective test results revealing an ongoing active Lyme infection and several co-infections and even Dr. Silverman's review, which Prudential obtained, and which confirmed that Ms.

Doe did have Lyme disease (at least for a time) and that her self-reported symptoms of pain and fatigue were consistent with the medical information in the record and that her continued medical follow up for clinical symptoms was appropriate based on her underlying diagnosis. In fact, Prudential had previously referred to Dr. Silverman as a "Lyme disease expert," and yet it ignored his review in reaching its 2009 determination.

98.    Once again, Prudential re-wrote history, reaching back to a medical review conducted in 2007 to support its decision to cease benefits in 2009.

**Ms. Doe's Additional Blood Test Results**

99.    On November 4, 2009, Ms. Doe's blood test results were positive for Bartonella henselae, her second co-infection associated with Lyme disease that had never previously been treated. Dr. Katz, Ms. Doe's treating Lyme disease expert, also wrote in his November 2009 office report that Ms. Does' "level of thyroid peroxidase antibodies are *high* at 187. This is over 5-fold the normal reference range of <35 IU/mL. This high presence of antibodies, coupled with patient's symptoms, are indicative of Hashimoto Disease." These test results were subsequently forwarded to Prudential.

100.   On February 2, 2010, and again on May 5, 2010, Ms. Doe's blood test results were positive for Mycoplasma pneumonia, a third co-infection associated with Lyme disease that is, according to medical literature, known to complicate the treatment and prognosis for recovery of Lyme disease patients.

101.   In March 2010, Ms. Doe began taking Tamoxifen, as prescribed by her oncologist to treat her LCIS.  Ms. Doe experienced significant side effects that have been

associated with this drug, including hot flashes, night sweats, sleep disturbances, memory and cognitive difficulties, nausea, weakness, and substantial weight loss. Many of these symptoms were already present due to Ms. Doe's Lyme disease and other tick-borne co-infections, but the Tamoxifen significantly exacerbated them.

102.    On September 9, 2010, Ms. Doe again tested positive for the co-infection Bartonella henselae.

## Ms. Doe's Appeal of Prudential's Second Termination of Benefits – April 2010.

103.    In April 2010, Ms. Doe submitted yet another appeal of Prudential's attempts to limit her receipt of benefits, arguing that Prudential's decision was based on a selective review of her medical record and justified by inaccurate renderings of the information supporting her claim.

104.    In support of her appeal, Ms. Doe submitted an independent medical report from a nationally recognized Lyme disease expert, Dr. Leo Shea (neuropsychologist), as well as updated affidavits and medical records from Dr. Katz.  In particular, Dr. Katz's office report from November 2009 stated, *inter alia*, that "[b]ased on my numerous years of experience specializing in the diagnosis and treatment of neurologic Lyme Disease and its related tick borne infections, *it is my opinion that there is a direct causal relation between [Ms. Doe's] symptoms and her medical conditions and her tick borne illnesses confirmed by positive blood test results over the past four years*." (Emphasis added).

105.    Dr. Shea opined that "the cause of [Ms. Doe's] difficulties is based on the resultant cognitive, not psychiatric sequelae of Lyme disease."  (Emphasis in

original).  He determined that Ms. Doe did not meet *any* of the diagnostic criteria for somatoform disorder under the DSM-IV, except to note that her medical condition did result in a decline in her functioning, as reported and observed by her family, work colleagues and treating physicians.  Dr. Shea opined that "there is nothing in the results nor is there any historical evidence to suggest" that Ms. Doe has any mental illness.

106.  After receipt of Ms. Doe's appeal, Prudential requested that Ms. Doe sign a release authorizing Dr. David Fisher to obtain her raw data from her earlier neuropsychological exams for purposes of Dr. Fisher conducting a file review. Ms. Doe complied with Prudential's request with respect to Dr. Fisher.

## Prudential's Decision to Uphold its Termination of Ms. Doe's Benefits – September 2010.

107.  Five months after submitting her appeal, Prudential's deadline for a decision came and went without a decision.  On September 23, 2010, Prudential upheld its termination of Ms. Doe's benefits, stating that "there is no evidence of a functional impairment from an infectious disease perspective from October 10, 2009 forward."  Prudential offered no explanation as to how it determined that October 10, 2009 was the cut off date for Ms. Doe's functional impairment from an infectious disease, although once again, Prudential appeared to contradict its prior findings.  Specifically, in September 2010, Prudential conceded that Ms. Doe suffered from a functional impairment due to an infectious disease, and not a mental illness, until October 10, 2009.

108.  Prudential also approved Ms. Doe's claim for a closed period of time, from October 10, 2009 to April 23, 2010, on the erroneous basis that Ms. Doe suffers

from a mild form of somatoform disorder, which Prudential claimed is a mental illness subject to the Plan's Limitation. Prudential did not pay Ms. Doe any interest on the back benefits it had wrongly denied her.

109.    Prudential's decision was based solely upon the medical reviews of Ms. Doe's file conducted by Drs. Daniel Craven, J. Robert Yohman and John Brusch. Dr. Craven is the only one of these three doctors who acknowledged having any experience in the diagnosis and treatment of patients with Lyme disease and other tick-borne co-infections.

110.    Following a review of Ms. Doe's medical records, Dr. Daniel Craven concluded on June 10, 2010 that many of Ms. Doe's symptoms are suggestive of "… post-infectious syndrome, *and also is seen in some patients with 'chronic Lyme disease.'*" (Emphasis added). He opined that "there are a number of patients who experience Lyme disease or other infectious diseases like mononucleosis in which *their recovery can be slow, incomplete and variable.*" (Emphasis added). He also noted that the spectrum of Lyme disease can run from those who rapidly recover to "another group of people that are slow to recover and some *who may never recover completely from their infection.*" (Emphasis added). Finally, Dr. Craven opined that cognitive complaints "may be present in some patients" during the acute phase of Lyme disease, and "could be related to dissemination of *Borrelia burgdorferi,* the bacteria causing Lyme disease, from the initial bite site to other areas in the body." All of Dr. Craven's offered explanations for Ms. Doe's on-going symptoms were medically based; he made no mention that her illness could be psychologically based.

111.   Prudential ignored Dr. Craven's support for Ms. Doe's medical disability, choosing instead to dismiss his findings on the basis that he concluded that he was unable to opine as to Ms. Doe's functional limitations as he was not qualified to do so.

112.   On August 11, 2010, Dr. J. Robert Yohman conducted a review of Ms. Doe's neuropsychological evaluations and raw test data, concluding that Ms. Doe suffered from "a diagnosis of somatoform disorder, such as somatization disorder, conversion disorder, or undifferentiated somatoform disorder." Ms. Doe never signed a release authorizing Dr. Yohman to obtain and review her prior neuropsychological evaluations or raw test data.

113.   Upon information and belief, Dr. Yohman, who advertises his services on www.superpages.com as a certified public accountant and psychologist (*see* http://www.superpages.com/bp/Houston-TX/J-Robert-Yohman-PC-J-Robert-Yohman-CPA-L2176906033.htm),     has     a     history     of     conducting neuropsychological testing and reviewing neuropsychological test reports on behalf of insurance companies in Lyme disease cases. Dr. Yohman routinely concludes in these reviews that the claimants suffer from somatization or somatoform disorder.

114.   The third medical review conducted at Prudential's request was performed by Dr. John Brusch, who Prudential claimed was a Lyme disease expert. However, the Cambridge Health Alliance website indicates that Dr. Brusch's specialties are primary care - adult medicine, geriatrics and infectious disease. Moreover, a diligent search of Dr. Brusch's name along with Lyme disease revealed only one

result – an ERISA case where Dr. Brusch performed a medical examination for an insurance company of a plaintiff with Lyme disease.

115. Nonetheless, relying heavily on quotations from Dr. Brusch's report, Prudential concluded that "there is no credible evidence that [Ms. Doe] has the infectious diseases of Lyme disease or babesiosis that have been diagnosed as being the etiology of her functional impairments." Dr. Brusch even took the position that there was no credible evidence that Ms. Doe was *ever* infected with Lyme disease. Dr. Brusch's report did not even mention Ms. Doe's co-infections of Bartonella henselae or Mycoplasma pneumonia, the correlating symptoms she reported experiencing with them, or their possible impact on her disability. Nor did Dr. Brusch mention the substantial side effects that Ms. Doe was experiencing from Tamoxifen to treat her LCIS.

116. On October 18, 2010, following Prudential's termination of Ms. Doe's benefits, and its breach of Ms. Doe's privacy, Ms. Doe revoked her authorization allowing Prudential to disclose her medical records to third parties. This was not the first breach of Ms. Doe's privacy; in an earlier appeal, Ms. Doe discovered that Prudential had sent out her case file to a law firm to determine if she would qualify for Social Security disability income benefits even though Prudential did not have a valid release on file.

117. Ms. Doe does not qualify for Social Security disability income benefits as she is not totally, but partially, disabled.

**Ms. Doe's Appeal of Prudential September 2010 Termination - January 2011.**

118.   On February 10, 2011, Ms. Doe again appealed Prudential's September 2010
       decision to limit her benefits under the Mental Illness Limitation. This was Ms.
       Doe's sixth appeal of Prudential's adverse benefit determinations in four years.

119.   Ms. Doe appealed and submitted updated medical records from her treating Lyme
       expert, Dr. Katz, updated affidavits and statements regarding her functional
       limitations and an independent neuropsychological examination conducted by a
       Lyme expert, Dr. Leo Shea.

120.   In support of her appeal, Ms. Doe also submitted copies of the documents on file
       at the Massachusetts Department of Public Health (DPH) on her specific case of
       Lyme disease.   Upon information and belief, doctors are required to report
       positive blood test results or clinical diagnosis of Lyme disease to the DPH, who
       then investigates the reported case for surveillance purposes.   Ms. Doe's
       numerous positive blood test results were reported to the DPH, as well as other
       pertinent information from her treating physicians.   Following the DPH's
       investigation into Ms. Doe's case, it classified her case of Lyme disease as
       "confirmed."     In her appeal, Ms. Doe also submitted evidence that her Lyme
       disease was considered "confirmed" according to the CDC.

**Prudential's June 14, 2011 Termination of Ms. Doe's Benefits.**

121.   Ms. Doe, through counsel, informed Prudential that she would provide Prudential
       with permission to disclose her medical records and raw test data to third parties if
       properly requested by Prudential.   Prudential never asked Ms. Doe to execute a
       release for her medical records.

122. On June 14, 2011, over six months after Ms. Doe submitted her appeal, and over ninety days after the expiration of its timeframe to review Ms. Doe's appeal under ERISA, Prudential upheld its termination of Ms. Doe's benefits under the Mental Illness Limitation.

123. Prudential's decision was based exclusively upon two file reviews of Ms. Doe's records conducted by Dr. Robert Denney, a neuropsychologist, and Dr. Omowunmi Osinubi, an anesthesiologist and environmental and occupational health doctor from New Jersey.

124. Instead of requesting Ms. Doe's permission to disclose her medical records to a third party, Prudential disclosed Ms. Doe's confidential medical records to Dr. Osinubi for review and comment without a valid release.

125. Likely realizing its error, Prudential captioned Dr. Osinubi's report as a "Prudential *Internal* Physician File Review." (Emphasis added). However, later in her report, Dr. Osinubi listed herself as a PDA (Professional Disability Associates) Medical Consultant. PDA is a third-party vendor who arranges medical reviews and independent medical examinations for "major disability insurers and self insured employers." (*See* http://www.professionaldisabilityassociates.com/).

126. Dr. Osinubi's curriculum vita does not list Prudential as an employer.

127. When questioned about this discrepancy, Prudential noted in a letter dated June 24, 2011: "Of note, Dr. Osinubi is employed by PDA and is partnered with Prudential in the role of a professional medical consultant."

31

128.    On information and belief, Dr. Osinubi's claim to be an "internal doctor" for
        Prudential on her April 4, 2011 review is an intentional misrepresentation.

129.    Moreover, Dr. Osinubi is not a Lyme disease expert, nor does she purport to have
        any experience with the illness or its related tick-borne co-infections.

130.    Dr. Osinubi's report regarding Ms. Doe's medical condition is replete with errors,
        distortions, and material omissions regarding Ms. Doe's medical condition,
        medical history, test results and symptoms.

131.    Prudential's decision to hire an anesthesiologist and environmental and
        occupational physician to review Ms. Doe's claim constitutes a violation of
        ERISA's implementing regulations, which requires that a physician familiar with
        a claimant's specific illness be retained to review claims on appeal.

132.    Despite the errors in Dr. Osinubi's reports, Prudential sent Dr. Osinubi's April 4,
        2010 report to Dr. Denney for his review as a part of Ms. Doe's medical file.

133.    Prudential refused to send Dr. Osinubi's report to Ms. Doe for her review and
        response, despite her request to respond to the report and despite the fact that
        Prudential possessed this report for almost two months before sending it to Dr.
        Denney for inclusion in his report.

134.    Dr. Denney was retained by PsyBar, a vendor acting as Prudential's agent who
        provides medical and vocational services to insurance companies and employers,
        to review Ms. Doe's file. *See* http://www.psybar.com/ins_overview.htm.

135.    PsyBar sent Dr. Denny a copy of Ms. Doe's medical and neuropsychological
        records without a valid release. In fact, at the time these records were sent to Dr.
        Denney, Ms. Doe's counsel and Prudential were still in the process of negotiating

32

an appropriately worded release to protect Ms. Doe from unauthorized dissemination of this highly private information.

136. PsyBar's file, provided to Ms. Doe in response to a written request to which Prudential was copied, indicates that PsyBar doctors review and comment upon draft reports written by its doctors before these reports are submitted to insurance companies.

137. In Ms. Doe's case, PsyBar employees reviewed and made changes to draft reports submitted by Drs. Nelson and Denney. Only portions of the edited reports were provided by PsyBar to Ms. Doe, in part because it appears that many of the changes were performed via fax.

138. According to PsyBar, Prudential requested that a neuropsychologist familiar with Lyme disease be retained to review Ms. Doe's file. When such an expert could not be located, Prudential agreed instead to hire Dr. Denney, who does not have any experience with Lyme disease, at a cost of approximately $11,000.

139. Documents produced by PsyBar reveal that PsyBar forwarded Ms. Doe's raw test data and medical record to Dr. Denney before it had a valid release to do so, and while the parties were still discussing the wording of an appropriate release that would protect Ms. Doe's privacy and protect her from unauthorized dissemination of her records.

140. Dr. Denney's particular area of expertise is criminal forensics.

141. Dr. Denney concluded that Ms. Doe's symptoms were due to a somatoform disorder, even though Ms. Doe does not meet the standard diagnostic criteria for somatoform disorder as delineated in the DSM-IV. A diagnosis of somatoform

disorder requires that there be no general medical condition that accounts for a patient's symptoms. In determining that Ms. Doe's symptoms were "medically unexplained," Dr. Denney relied exclusively on the file reviews of Prudential's doctors who have no experience in Lyme disease or its co-infections, and he outright dismissed the opinions of Ms. Doe's treating Lyme disease experts (Drs. Katz and Shea), even though Prudential acknowledged that it required –and, in fact, desired – physicians familiar with Lyme disease to review Ms. Doe's appeal.

142.     Prudential also claimed, for the first time in four years, that Ms. Doe did not suffer from chronic Lyme disease, as such an illness does not exist.

## Ms. Doe's Response to Prudential's June 2011 Termination of her Benefits – August 2011

143.     On August 9, 2011, Ms. Doe wrote Prudential a response to its numerous denials and terminations of her claim, stating: "I have been so personally offended and astonished at many of the statements and outright falsehoods upon which Prudential has relied to deny my claim over the years that I felt compelled to write this letter. My attorney has very effectively and competently been my voice for the past few years while I sat by silently and watched Prudential distort the truth, make egregious misrepresentations about my medical history, accuse me of being mentally ill, and other insulting accusations that are almost too numerous and painful to recall."

144.     Ms. Doe did not provide Prudential with any new medical information regarding her claim, but rather, offered her personal perspective on Prudential's claims regarding her health and ability to work as well as her responses to Drs. Osinubi and Denney's reports, to which she had requested the opportunity to respond (and

which Prudential had refused) on several occasions prior to Prudential's June 2011 decision to uphold its termination of her benefits.

145. Also on August 9, 2011, counsel for Ms. Doe wrote Prudential a letter detailing the legislative action taken nationally to recognize chronic Lyme disease and to protect medical providers who prescribe intravenous antibiotics to treat individuals suffering from this recognized illness. This documentation was offered to Prudential in response to its claim that chronic Lyme disease was not an actual illness. At the conclusion of the letter, Ms. Doe's counsel asked Prudential to let her know if it had any questions or concerns over any the information contained therein, and asked that Prudential notify her if it did not intended to respond in order to avoid unnecessary delay.

146. On August 25, 2011, Prudential wrote Ms. Doe stating in relevant part: "As both letters indicate you do not wish to file a second appeal, Prudential will not be responding to your correspondence. Please be advised Prudential does not consider the additional documentation received on August 22, 2011 as part of the administrative record."

147. On September 6, 2011, Ms. Doe responded to Prudential's August 25, 2011 letter requesting that Prudential reconsider its June 2011 decision to deny her benefits based on the procedural errors contained therein. Ms. Doe indicated that she was not appealing Prudential's decision as she was not offering Prudential new medical or vocational information regarding her entitlement to benefits, as required for an appeal according to Prudential's June 2011 letter, but rather was

requesting a reconsideration based on the significant errors in Prudential's June 2011 decision.

148. On September 19, 2011, Prudential wrote Ms. Doe indicating: "We are in receipt of your letter dated September 6, 2011. Please refer to our letter dated August 25, 2011 for our position in the matter."

149. Through its September 19, 2011 letter, Prudential refused to reconsider its June 2011 decision despite the procedural deficiencies inherent in its review.

**Summary**

150. Ms. Doe has exhausted her administrative remedies pursuant to 29 C.F.R. 2560.503-1(1).

151. Any discretion to which Prudential may claim it is entitled under the Plan is negated by its failure to provide Ms. Doe with an explanation as to its adverse action and its failure to provide her with a full and fair review of her claim.

152. Prudential failed to meet the minimum requirements for the denial of Ms. Doe's LTD benefits, in violation of ERISA, 29 U.S.C. 1133, which requires that upon a denial of benefits, the administrative review procedure must include adequate notice in writing setting forth the specific reasons for the denial of benefits and a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

153. Prudential's decision to deny Ms. Doe benefits was based, *in toto*, upon file reviews conducted by physicians retained by Prudential, or by agents working on Prudential's behalf.

154. None of Prudential's physicians spoke to Ms. Doe's treating or examining physicians prior to rendering a decision on Ms. Doe's claim. None of Prudential's file reviewers expressed any interest in speaking with Ms. Doe.

155. None of Prudential's physicians are experts in Ms. Doe's particular illness, except for Dr. Donald Craven, whose supportive report of Ms. Doe's claim has been ignored or given no weight by Prudential and its subsequent file reviewers.

156. The Defendants and their medical and vocational reviewers arbitrarily dismissed Ms. Doe's self-reported symptoms – which were supported by numerous affidavits from work colleagues and family members - when they determined that Ms. Doe was not disabled.

157. The Defendants failed to address or analyze the findings of Ms. Doe's treating and independent physicians' opinions regarding Ms. Doe's symptoms, restrictions, limitations and disability.

158. The Defendants' file reviewers have ignored relevant blood test results that support Ms. Doe's claim, including but not limited to her positive blood test results for three other tick-borne co-infections, as well as blood test results supporting an auto-immune disorder caused by the Lyme disease.

159. The Defendants have failed to give any consideration to the numerous affidavits from Ms. Doe's work colleagues, family members and hairdresser in support of her claim.

160. Ms. Doe's partial disability is based on the substantial evidence in Prudential's possession.

161. The Defendants failed to provide Ms. Doe with a full and fair review of her claim for disability benefits.

162. The Defendants failed to respond to Ms. Doe's attempts to engage in a meaningful dialogue regarding the evaluation of her claim.

163. The decision to deny Ms. Doe benefits was wrongful, unreasonable, irrational, solely contrary to the evidence, contrary to the terms of the Plan, contrary to law, and in violation of Prudential's fiduciary obligations to Ms. Doe.

164. Prudential was influenced by its financial conflict of interest, as both the administrator of the plan and the payer of benefits there under, when it denied Ms. Doe benefits.

165. Prudential's conflict of interest is apparent in the innumerable justifications for denying, terminating and limiting Ms. Doe's benefits, which were internally contradictory, in direct opposition to the substantial medical information in the file, and made solely in Prudential's financial self-interest.

166. The Plan does not grant the Defendants independent and final discretion to determine eligibility for benefits or to interpret the terms of the Plan.

167. The procedural irregularities inherent in the Defendants' review of Ms. Doe's claim for benefits demonstrate that the Defendants' decision to deny Ms. Doe's benefits was unreasonable.

168. Remand is inappropriate in this case as Prudential has had over four years and six appeals by Ms. Doe to conduct a full and fair review of Ms. Doe's claim.

169. Prudential should not be rewarded for its unfair and unreasonable review of Ms. Doe's claim by being offered another bite at the apple by way of a remand.

170. Due to the unlawful denial of benefits under ERISA, Ms. Doe has lost her rightful long-term disability benefits. She has also suffered emotional distress, humiliation and breaches in her privacy as a result of the Defendants' actions.

171. Due to the unlawful denial of benefits under ERISA, Ms. Doe has also lost the use of her disability benefits, including interest thereon.

172. Even when Prudential previously approved Ms. Doe's claim or appeals and paid her the substantial back benefits to which she was owed, Prudential never paid her interest on the wrongfully withheld amounts. Prudential has been unjustly enriched by its own wrongful conduct.

## FIRST CAUSE OF ACTION
### (Enforcement of Terms of Plan
### Action for Unpaid Benefits and Employee Benefits)
### (ALL DEFENDANTS)

173. Ms. Doe re-alleges each of the paragraphs above as if fully set forth herein.

174. The Plan is a contract.

175. Ms. Doe has performed all of her obligations under the contract.

176. 29 U.S.C. § 1132(a)(1)(B) states that:

   A civil action may be brought ---

   a. by a participant or beneficiary –

      i. for the relief provided for in subsection (c) of this section, or

      ii. to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

177. The Defendants' actions constitute an unlawful denial of benefits under ERISA, as provided in 29 U.S.C. § 1132(a)(1)(B).

178. The Defendants unlawfully denied Ms. Doe's benefits in part by: (1) ignoring the substantial medical and vocational evidence in support of Ms. Doe's claim for benefits; and (2) denying Ms. Doe a full and fair review of their decision to deny her benefits.

179. In accordance with 29 U.S.C. §1132, Ms. Doe is entitled to be paid benefits under the Plan based upon her disabled status from January 2007, and continuing into the present.

180. The Defendants have refused to provide Ms. Doe with these disability benefits and is, therefore, in breach of the terms of the Plan and ERISA, which requires that the Defendants engage in a full and fair review of all claims and the administration of the Plan in the best interests of the Plan participants.

181. As a direct and proximate result of this breach, Ms. Doe has lost the principal and the use of her rightful LTD benefits.

## SECOND CAUSE OF ACTION
### (Attorneys' Fees and Costs)
### (ALL DEFENDANTS)

182. Ms. Doe re-alleges each of the paragraphs above as if fully set forth herein.

183. Under the standards applicable to ERISA, Ms. Doe deserves to recover "a reasonable attorney's fee and costs of the action" herein, pursuant to section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g).

184. The Defendants have the ability to satisfy the award.

185. Ms. Doe's conduct of this action is in the interests of all participants suffering from physical conditions who subscribe to the Plan, and the relief granted hereunder will benefit all such participants.

186. The Defendants have repeatedly and consistently acted in bad faith in denying Ms. Doe's benefits under the Plan.

187. The award of attorneys' fees and costs against the Defendants will deter others acting under similar circumstances.

## THIRD CAUSE OF ACTION
## (Invasion of Privacy)
## (PRUDENTIAL)

188. Ms. Doe realleges each of the paragraphs above as if fully set forth herein.

189. M.G.L.A c. 214 §1B (1988) provides that a person shall have a right against unreasonable, substantial, or serious interference with her privacy.

190. Prudential repeatedly disclosed confidential medical information regarding Ms. Doe to third parties without Ms. Doe's consent and without informing her of its decision to do so.

191. Prudential's breach of Ms. Doe's confidentiality through repeated unauthorized dissemination of her highly private medical and neurological records and raw test data violated Ms. Doe's right to be free from an invasion of her privacy.

192. The disclosures made by Prudential were unreasonable and a substantial and serious interference with Ms. Doe's privacy.

193. Ms. Doe has suffered emotional distress as a result of Prudential's violation of her right against invasion of privacy. Ms. Doe was emotionally and mentally distressed that her private medical and neuropsychological information was disseminated to third parties in direct violation of her wishes. Prudential's actions are even more egregious due to the fact that it (or its authorized agents acting on its behalf) continued the unauthorized dissemination of Ms. Doe's private records

even after being put on notice of past violations and while the parties were in the process of negotiating a narrowly tailored release that would protect Ms. Doe's privacy.

194.   As a result of the Defendants' actions, Ms. Doe has suffered emotional and financial distress.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that the Court:

(1)   Declare, adjudge and decree that Ms. Doe is entitled to ongoing LTD benefits as calculated under the terms of the Plan.

(2)   Award Ms. Doe the full amount of unpaid benefits under the Plan to which she is entitled, together with such pre-judgment interest as may be allowed by law.

(3)   Award Ms. Doe the full amount of damages to which she is entitled as a result of Prudential's breaches in her privacy;

(4)   Order that the Defendants make restitution to Ms. Doe in the amount of any losses sustained by Ms. Doe in consequence of the wrongful conduct alleged herein, together with prejudgment interest.

(5)   Award Ms. Doe the costs of this action and reasonable attorneys' fees; and

(6)   Award such other relief as the court deems just and reasonable.

Date: September 23, 2011          Respectfully submitted for the Plaintiff,

By:

Mala M. Rafik
BBO No. 638075
ROSENFELD RAFIK & SULLIVAN, P.C.
184 High Street, Suite 503
Boston, MA 02110
Tel. 617-723-7470
Fax. 617-227-2843
Email. mmr@rosenfeld.com